UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KYLE L. CLEVENGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Cause No. 1:12-cv-85-WTL-TAB |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Kyle L. Clevenger requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administrator (the "Commissioner"), denying his application for Disability Insurance Benefits ("DIB") and Supplemental Insurance Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court now rules as follows.

### I.   PROCEDURAL HISTORY

Clevenger initially filed an application for SSI on August 10, 2004, alleging disability beginning March 4, 2004; on April 7, 2005, he also filed an application for child's insurance benefits based on disability. Both claims came before an Administrative Law Judge ("ALJ") on August 1, 2007. On August 15, 2007, ALJ Peter C. Americanos issued his decision that Clevenger was not disabled as defined by the Act. On August 25, 2008, the Appeals Council denied Clevenger's request for review, and Clevenger thereafter filed in this Court a timely action for judicial review. On April 28, 2009, this Court entered an order pursuant to the parties' Stipulation to Remand. Pursuant to this Court's order, the Appeals Council remanded the case for further proceedings.

A supplemental hearing was held on January 28, 2010, before ALJ Americanos, during which Clevenger was represented by counsel. Clevenger, Clevenger's father, and a medical expert testified at the hearing. On May 14, 2010, the ALJ issued his decision that Clevenger was not disabled as defined by the Act. On December 2, 2011, the Appeals Council denied Clevenger's request for review, and Clevenger thereafter filed this timely action for judicial review.

## II.     EVIDENCE OF RECORD

The relevant medical evidence of record follows. Clevenger had just reached his twenty-first birthday shortly before the first hearing on August 1, 2007. He attended school through ninth grade and then he was homeschooled during his tenth grade year. He does not have any past relevant work. He suffers from systemic lupus erythematosus ("lupus"), heart problems as a result of his lupus, and more recently from depression.

Clevenger has a severe form of lupus that caused him to develop progressive aortic insufficiency. His condition was diagnosed in the summer of 2001. In August 2003, he underwent surgery for aortic valve replacement.

At the time of the first hearing in August 2007, Clevenger had been treated by Dr. Susan Ballinger for his lupus since November 2000 and he had seen her approximately every two to three months. According to Dr. Ballinger, Clevenger's fatigue, pain and other symptoms are severe enough to frequently interfere with Clevenger's attention and concentration. Dr. Ballinger further expressed the opinion that Clevenger is incapable of even "low stress" jobs.

In terms of functional limitations, Dr. Ballinger stated that the plaintiff can walk one city block without rest, he can sit for two hours at one time before needing to get up, and he can stand for thirty minutes at one time before needing to sit down or walk around. He can sit less than two

hours total in an eight-hour work day and he stand/walk less than two hours total in an eight-hour work day. If he were to get a job, he would require one that allowed him to shift positions at will from sitting, standing, or walking. He would also need to take unscheduled breaks two to three times per day for fifteen minutes each, during which time he would need to lie down.

According to Dr. Ballinger, Clevenger can rarely lift less than ten pounds and he should never lift as much as ten pounds. Furthermore, he should never twist, stoop, bend, crouch, squat, climb ladders, or climb stairs. He can use his hands for grasping, turning, and twisting objects and his fingers for fine manipulations twenty-five percent of an eight-hour work day, but he should not use his arms at all for reaching, including overhead. Dr. Ballinger also stated that Clevenger should avoid all exposure to extreme cold and heat. He should also avoid concentrated exposure to high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases, dust, and chemicals. Dr. Ballinger acknowledged that Clevenger's impairments were likely to produce good days and bad days, but in the event Clevenger were able to get a job he would likely be absent from work as a result of his impairments or treatment for more than four days per month.

After the first hearing, Dr. Ballinger explained her answers in her original questionnaire with a letter to Clevenger's attorney. In that letter, Dr. Ballinger explained,

> Many of [Clevenger's] activity limitations are based on a combination of this underlying cardiac disease and his aortic valve replacement and the anticoagulation he must continue to prevent blood clots.
>
> . . . .
>
> To address [Clevenger's] fatigue, there is laboratory data that suggests that [Clevenger's] SLE is active and active Lupus causes fatigue. Lupus and underlying cardiac disease are both known, well accepted and well documented in the literature as etiologies of fatigue. By what criteria does the consultant propose these etiologies are ruled out as the main cause of [Clevenger's] fatigue?

. . . .

> When I discussed [Clevenger's] limitations with Dr. Hurwitz today, the explanation he gave for the limitations he set out was that [Clevenger] has a stressed heart because of his aortic valve problem. The valve itself should not be stressed and he would define this as isometric exercise which he considers lifting anything more than 20 pounds at a time.

Clevenger's cardiologist, Dr. Roger Hurwitz, also completed a residual functional capacity questionnaire. According to Dr. Hurwitz, Clevenger can tolerate no more than modest stress due to his significant residual heart disease and hypertension. Clevenger's cardiac symptoms were severe enough to often interfere with attention and concentration. In terms of functional capacity, Clevenger can walk one to two city blocks without rest or severe pain, he can sit for two hours at one time before needing to get up, and he can stand for one hour at one time before needing to sit down or walk around. In a normal eight-hour work day, Clevenger can sit for about four hours and he can stand/walk for about two hours. Clevenger can lift occasionally less than ten pounds, rarely lift as much as ten pounds, and never as much as twenty pounds. Clevenger can occasionally twist, stoop, bend, and crouch, and he can rarely climb ladders or stairs. Clevenger should avoid concentrated exposure to extreme cold, wetness or humidity. He should avoid even moderate exposure to extreme heat and fumes, odors, dust, gases, and poor ventilation. If Clevenger were to get a job, he would likely miss about two days per month as a result of his impairments or treatment. Clevenger would also need to take unscheduled breaks during an eight-hour work day, approximately two to three times per day for fifteen minutes each.

Dr. Maya Hosein also conducted an examination of Clevenger for the Indiana Department of Family and Social Services Disability Determination Bureau on November 5, 2009, and assessed his functional capacity. According to Dr. Hosein, Clevenger would be limited

4

to sitting for twenty minutes at one time, and for one hour total in an eight-hour work day; to standing for six to ten minutes at a time, and for no more than thirty minutes in an eight-hour work day; and to walking four to five minutes at a time, and for thirty minutes total in eight-hour work day. He could walk no more than a block on uneven surfaces. Clevenger was further restricted from any exposure to unprotected heights, and could tolerate only occasional exposure to moving machinery. He had limitations in driving and traveling due to dizzy spells.

In January 2010, family physician Dr. Bianca David reviewed Clevenger's ailments and opined that he could not hold a job based on his co-morbidities.

At the second (January 2010) hearing, Clevenger alleged disability due to fatigue, joint pain, and depression. He testified that he tried to work in 2009 but found it too stressful and became depressed. Clevenger reported that he spent most of the day sleeping but that he helped his father take care of his baby daughter. Clevenger's father testified that he helped Clevenger care for his daughter every day while Clevenger's girlfriend was working, that Clevenger slept much of the day, and that he had recently been having daily crying spells.

A medical expert, Dr. Paul Boyce, also testified at the second hearing. Dr. Boyce testified that he had reviewed the entire medical record. He opined that Clevenger's aortic valve replacement in 2003 had been "very successful" and that cardiac workups and examinations since that time had been essentially normal. He opined that Clevenger did not have a cardiac condition that would explain his complaints of extreme fatigue "other than if there's an element of deconditioning because of being sedentary." Dr. Boyce also noted that Clevenger had lupus and occasionally complained of joint pain but he opined that the record revealed only occasional trace swelling in Clevenger's joints. Dr. Boyce testified that, given Clevenger's cardiac impairment alone, he would limit Clevenger to a range of medium exertion work but that he

5

would further limit Clevenger to light exertion work due to his lupus. He also opined that Clevenger should avoid extreme temperatures, unprotected heights, and dangerous cutting machinery because he was taking blood thinners. Dr. Boyce testified that he did not agree with the opinions of Dr. Ballinger because, while he was assessing Clevenger's limitations "on the record," Dr. Ballinger was assessing his limitations "on things that can happen but they haven't happened by this record."

### III.    APPLICABLE STANDARD

In order to receive benefits, a claimant must be disabled. For the purposes of DIB, disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

A claimant under age eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). A claimant over age eighteen must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. 404.1520(b); 20 C.F.R. § 416.920(b); 20 C.F.R. § 416.924(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. 404.1520(c); 20 C.F.R. § 416.920(c); 20 C.F.R. § 416.924(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. 404.1520(d); 20 C.F.R. § 416.920(d); 20 C.F.R. § 416.924(d). With respect to a claimant under the age of eighteen, the resolution of step three ends the disability inquiry. 20 C.F.R. § 416.924(a). Otherwise, the ALJ continues the analysis. 20 C.F.R. 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. 404.1520(f); 20 C.F.R. § 416.920(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. 404.1520(g); 20 C.F.R. § 416.920(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir.2008). The ALJ is required to articulate only a minimal, but

legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision. While he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV. THE ALJ'S DECISION

The ALJ found at step one that Clevenger had not engaged in substantial gainful activity since the alleged onset date of March 4, 2004. At step two, the ALJ concluded that Clevenger had the following severe impairments before attaining age eighteen: systemic lupus erythematosus and associated aortic heart valve disease with heart valve replacement. At step three, the ALJ found that those impairments did not meet or medically equal a listed impairment. The ALJ therefore concluded that Clevenger was not disabled prior to attaining age eighteen.

The ALJ then turned to determining whether Clevenger was disabled after attaining age eighteen. At step two, the ALJ concluded that Clevenger had had the following severe impairments since attaining age eighteen: systemic lupus erythematosus and associated aortic heart valve disease with heart valve replacement. The ALJ then found that Clevenger's depression and anxiety were non-severe. At step three, the ALJ found that Clevenger's impairments (including the non-severe impairments) did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Clevenger had the residual functional capacity ("RFC") to perform light work "performed in a work environment relatively free of temperature extremes, as well as noxious fumes, gases, respiratory irritants, and which further did not involve working around cutting implements, power tools or those who use them." The ALJ then

found that Clevenger had no past relevant work. However, based on Clevenger's age, education, work experience, and RFC, the ALJ found that he could perform jobs that existed in significant numbers in the national economy, such as housekeeper, packing line worker, and apparel sorter. Therefore, the ALJ determined that Clevenger was not disabled as defined by the Act from July 1, 2004, the day Clevenger turned eighteen, through the date of the ALJ's decision.

## V.  DISCUSSION

Clevenger advances several objections to the ALJ's decision; each is addressed below.

### A. Weight Accorded to Treating Physicians

Clevenger argues that the ALJ erred in rejecting the opinions of Drs. Ballinger, Hurwitz, and David as to his functional capabilities.

> A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). An ALJ who rejects a treating physician's opinion must provide a sound explanation for the rejection. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).

*Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). "'If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2))).

According to Clevenger, "the majority of factors set forth [above] clearly weigh in favor of giving controlling weight to the opinion of at least Dr. Ballinger and Dr. Hurwitz, if not Dr. David." For example, "[b]oth Dr. Ballinger and Dr. Hurwitz had seen [Clevenger] a number of times over many years" and Dr. Ballinger is a rheumatologist by specialty, while Dr. Hurwitz is

9

a professor of pediatrics. However, the ALJ rejected the opinions of these doctors as "conclusionary [sic] statements wholly unsupported by any clinical evidence, including their own medical reports." The Court finds that the ALJ's reasons for rejecting these doctors' opinions was clearly wrong and that other factors certainly argue in favor of giving them controlling weight.

      As an initial matter, the Court notes that the opinions of Drs. Ballinger and Hurwitz are far from "conclusionary." Drs. Ballinger and Hurwitz gave detailed functional limitations supported by Clevenger's longitudinal medical history, of which they had personal knowledge as they had treated Clevenger for many years. On the other hand, Dr. David's recommendation merely lists Clevenger's ailments before stating that Clevenger "cannot hold a job with all the comorbidities he has." Such a conclusion indeed sheds little useful light on the inquiry before the ALJ—Clevenger's functional limitations—and it was not error for the ALJ to give Dr. David's opinion here little weight.

      The ALJ found that the opinions of Drs. Ballinger and Hurwitz as to Clevenger's disabilities were not supported by their own medical records, but the ALJ's analysis does not bear this out. For example, the ALJ noted that Dr. Hurwitz assessed Clevenger with a New York Heart Association classification of Class II, which indicated that Clevenger would be "comfortable at rest and would have only mild symptoms and slight limitation during ordinary activity" and assessed this fact as inconsistent with the doctor's reported limitations. However, the limitations indicated by a Class II assessment are of particular relevance here, and support the doctor's limitations. According to the New York Heart Association, patients in Class II indeed have "slight limitation of physical activity," but "[o]rdinary physical activity results in fatigue, palpitation, dyspnea, or angina pain." *NYHA Classification – The Stages of Heart Failure*, Heart

Failure Society of America, http://www.abouthf.org/questions_stages.htm (last visited Jan. 14, 2013). A conclusion that Clevenger is limited in his abilities as a result of fatigue is entirely consistent with the record evidence, even with a Class II assessment, and is even more so when one considers that Clevenger's lupus also contributed to his fatigue.

Likewise, the ALJ noted that Dr. Ballinger's own reports consistently describe Clevenger as doing well, even "great," with few, if any, complaints at all. However, the Seventh Circuit has recognized the relative nature of such reports: "A quadriplegic, for example, may 'feel well' or may 'feel good' but be unequivocally disabled; whereas, someone with the common cold may report 'feeling terrible' but be mostly able to perform his or her usual and customary work. Conversely, one who is disabled may indeed feel bad, and one who is not may feel well." *Micus v. Bowen*, 979 F.2d 602, 606 (7th Cir. 1992). It was error for the ALJ to rely on simple social pleasantries to establish an inconsistency with the objective record evidence. *See id.*

Clevenger also argues that the ALJ "did not even consider" a letter from Dr. Ballinger in response to issues raised in the ALJ's first unfavorable decision "despite being ordered to on remand." This is not entirely accurate. The ALJ did set forth the content of that letter. However, the ALJ curiously neglected to put the letter in conversation with the inconsistencies he had earlier identified. For example, in this letter Dr. Ballinger explains that Dr. Hurwitz's limitations stem in part from his opinion that Clevenger's artificial heart valve should "not be stressed," yet the ALJ does not address the impact of this statement on his decision. The ALJ did not give any indication of a rational basis for his reasoning in light of the letter's response to his earlier decision, and his decision is insufficient in this way.

In sum, it was error for the ALJ to accord little weight to the treating physicians' opinions; the decision of the ALJ must be reversed on this basis.

The Court notes that the ALJ also discredited consultative examiner Dr. Hosein's prescribed limitations as "conclusionary" and not supported by any "real medical rationale." However, Dr. Hosein's report indicates that he had reviewed medical documentation sent to him from the Disability Determination Bureau and his assessment is detailed and thorough. The ALJ also concluded that Dr. Hosein's limitations in sitting, walking, and standing were not supported by the evidence because Dr. Hosein had reported normal gross and fine motor skills as well as a normal gait. In so assessing Dr. Hosein's report, the ALJ lost sight of the context of Clevenger's claim – that is, extreme fatigue. It is not inconsistent to say that a person may have normal gross and fine motor skills, but may nevertheless not be capable of repeated performance of those skills because he suffers from extreme fatigue brought about by lupus and a weakened heart. Furthermore, it is unclear what bearing normal gross and fine motor skills have on one's ability to sit for extended periods of time, yet the ALJ found that Dr. Hosein's recommendation limiting Clevenger's ability to sit was not supported by the doctor's report. As a result, the ALJ's analysis of Dr. Hosein's assessment fails to build an accurate and logical bridge to his conclusion – that is, his rejection of Dr. Hosein's report.

### B.  Credibility Determination

According to Clevenger, the ALJ erred in rejecting Clevenger's allegations of severe fatigue. An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). However, in determining credibility, an ALJ must consider several factors, including the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); SSR 96–7p, and

justify the finding with specific reasons. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). The ALJ need not cite findings on every factor provided in 96–7p, but the ALJ must articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi v. Barnhart,* 315 F.3d 783, 787–88 (7th Cir. 2003) (citing SSR 96-7p). "Furthermore, the ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Id.* (citations omitted).

First, Clevenger argues that the ALJ erred when he found that Clevenger's mental impairments were not severe, in part because the ALJ rejected Clevenger's allegations of severe fatigue stemming from his mental impairments. While the ALJ did weigh Clevenger's allegations against the contrary objective medical evidence ("mental status findings," "modest medication therapy," and an absence of "ongoing mental health treatment"), he also considered Clevenger's testimony as to his daily activities. Specifically, the ALJ did not find it "plausible that the claimant's girlfriend would allow him to watch her daughter if he did sleep most of the day," even though the claimant's father also helped care for the child. However, rejecting the claimant's allegations on this basis is illogical; the fact that the Clevenger's father and grandmother constantly accompany him when he takes care of the baby are a testament to the validity of Clevenger's allegations that he is too fatigued to do so by himself. Furthermore, according to the ALJ, because the claimant's father helped him with caring for his child, "it would seem that if the claimant truly did have such a debilitating problem with sleep and fatigue, [the child's mother] simply would leave the child at the claimant's father's home." It seems the ALJ rejected Clevenger's allegations because he did not approve of the setup Clevenger's family

had devised. But simple disagreement with a chosen method of accommodating one's limitations is hardly a reason to discredit allegations of those limitations outright. The ALJ's analysis of the subjective evidence he used to support his finding that Clevenger's allegations were not credible is patently wrong and must be reversed.

 Second, Clevenger contends that the ALJ erred when he found that Clevenger's lupus and heart problems did not meet or equal a listing, in part because the ALJ found "no serious problems with fatigue." The ALJ found that the allegations of fatigue were not "indicated by a substantial portion of the record." Specifically, the ALJ found that Clevenger's most recent allegations of continued fatigue in records from 2007 and 2009 were "contradicted" by reports that he was doing "great" in records dating back to 2004, 2005, and 2006. However, the Court finds nothing contradictory in records indicating that, while Clevenger did not experience fatigue in 2004, 2005, or 2005, that he did feel fatigue in 2007 and 2009.[1]  The ALJ's resulting analysis is patently wrong and must be reversed.[2]

---

[1] Of course, the timing of these records might be relevant to determining *when* Clevenger became disabled, but the records do not provide a sound basis for discrediting later testimony.

[2] The ALJ also erred, Clevenger argues, when he failed to considered the "combined effect" of Clevenger's conditions on his energy level. Insofar as the etiology of the generalized fatigue alleged here is irrelevant so long as credible allegations of fatigue are incorporated into Clevenger's functional limitations, the ALJ did not err in this way.

### VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry. In light of the fact that ALJ Americanos has had two opportunities to review Clevenger's case, the Court believes that this case would benefit from fresh eyes, and therefore recommends that a different ALJ be assigned to this case on remand.

SO ORDERED: 01/15/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.